Good morning, Tracey Dressner for Kishner-Mares, and I appreciate that the Court is switching the calendar today. Do you have some electricity to go out at your house? Electricity, we had a late flight, got home late, very late last night. But I think I'm set now. I'm not sure if the Court has a particular interest in one or both of the issues. Unless the Court elects otherwise, I'm going to start with the Beck issue. It's my position that the Beck case clearly establishes that when a defendant is facing death, that the jury be given any lesser-included instructions that apply, so that the jury is not faced with an all-or-nothing choice. What happened in this case, at the time that the jury instruction decision was being made, Mr. Mares was facing death. The judge rejected the defense request for lesser-included instructions. The jury convicted Mr. Mares of first-degree murder with special circumstances. And then in the penalty phase, the jury came back with an L-wall, a life without the possibility of parole. It's my position that the Court erred in not giving the lesser-included, and that the application of Beck can't depend on what the ultimate outcome was, meaning that the judge is not erroneous in declining to give it. Isn't that right? That I completely agree with. In this case, there was a court, which is the final expositor of State law, says there wasn't sufficient evidence to support the instruction. They're not the final expositor if, in fact, the facts establish it. And I think the facts establish not just one, but two different theories of second-degree murder. And I think I laid those out pretty clearly. This was a case where the jury easily could have found that they were unpremeditated, intentional killing. And the jury also could have found that they were premeditated. What evidence would have supported that? Well, that Mr. Mares was driving, that there were one or two gang members in his car, that his passengers started a, there was an invasion. But his story is he didn't know any of this. But his story ultimately doesn't matter, because it's what the facts show. And the facts show that he was driving the car, that there was a verbal altercation, that his passengers got out of the car, there was a shooting. That could be spontaneous as well as premeditated. Up to the jury to make that determination. The second is an implied malice theory where the Mr. Mares engaged in an inherently dangerous act with conscious disregard for human life by getting, he and his gang member friends got into a car with weapons, drove into enemy gang territory, knowing that there had been a spat of gang killings. That in itself, given that, is an inherently dangerous act with conscious disregard for human life. Either one of those or both of those theories should have been given to the jury. The criteria for giving a lesser included is very small. As long as there's some evidence supporting it, the jury has to be given it. And it doesn't, the judge can't take into account. The testimony doesn't matter? The credibility of the witnesses doesn't matter. There was evidence based just on what happened that supported both of those lessers. And that's for the jury to determine. And particularly in a death penalty case where you have, this was a high profile case involving the killing of a police officer. The jury was not, this was an absolute all or nothing choice. The jury is not going to not convict him and let him, and run the possibility he's going to walk out. And the only thing they're given, the only choice they're given is a capital murder. It's exactly what death is driven, is for. And it can't be that the jury, that the court erred at the time they did it. But because he ultimately wasn't sentenced to death, he's not entitled to a jury instructed with lesser included. That is, he'd be in a better position under the position taken by respondent. Mr. Maris would be in a better position today if he'd been sentenced to death. Usually, and until we speak this time, if we say what you want us to say, the court instructs based on the case before. In the evidence before the court, at that time, the trial judge was wrong, and the state court in upholding it was wrong because the facts, whether you believe they're strong or not strong, there was some evidence that supported the giving of two different, of lesser included, of second degree murder under two different theories. Some evidence. It's very low standard. The judge doesn't take into account credibility of the witnesses. The judge doesn't take into account whether he personally would have believed it. If there was some evidence, and I've given the court two different theories under which there was some evidence that supported it, the court was obligated to give it. Under State law, that would have been the end of it if they had not been seeking death, but because they were seeking death, we have a Federal constitutional issue because the United States Supreme Court has said when the State is seeking death, the defendant has an absolute right to lesser included, to relevant lesser included instruction. We have that situation here. The, not, that's all I have to say about Becca if there's not further questions. I'll turn to the grand jury issue. And in some ways, I think there's some overlap between the two just because of the position the state court took in both of these issues, which is not really looking at the facts. And again, I think the overarching issue in this case is that this was a high profile killing of a police officer and may have shaded the way things were done in this case. But I think it's undisputed, as far as I can recall from the briefing, that there was an absolute disparity rate of 15.2 percent in this case between underrepresentation of Hispanics in the grand jury pool. But the state court has steadfastly received. What is that? That's not my recollection of what I read in the record. What is the 15.2 percent based on the experts' prediction as to what the population may have become? It was the experts' prediction that was then substantiated by the 2000 census, which supported the experts' prediction. Absolutely. And that shows, again, the factual wrongness of what happened in the state court. Judge Eidman, who this motion was initially before at the pretrial phase, kept saying, but this doesn't take it into account, yet the experts said repeatedly that this was based on Hispanics who were over the age of 18, who were U.S. citizens, who were English speakers and who were not institutionalized And Judge Eidman's concern was that they were talking about non-citizens and just refused to hear that they were taking into account citizens. And so based on that, those four criteria, the experts' statistics were actually that of the, that they were rounding off 2.7 million Hispanics in L.A. County in 1999, but only 1 million of them, which was only 38.9 percent of the population jury eligible. Seems like a very small number. Takes into account those factors. So the court's reliance on that is just, is completely factually inaccurate. What happened was when the grand jury indicted Mr. Marison in June of 1999, in January of 2000, they first raised the underrepresentation. At that time, using the 1990 statistics, now 1990 or 1999, and there's a large and growing population of Hispanics in L.A. County, they used, based on the 1990 census, and came up with a 9.2 percent figure. And told the court at that time, we're working on getting population estimate figures. Several months later, I believe it was several months later, it was again before the trial began, they updated their motion with population statistics estimates that were taken from California state government offices. And based on that, their same expert opined that there was a 15.2 percent disparity rate. Absolute disparity rate. Court refused to consider it, said, you know, well, you know, how do we know they're not doing jury eligible, blah, blah, blah, and wouldn't consider it. And said, well, I want to rely only on census figures. I don't want to rely on estimates. The trial began not long into the trial. The 2000 census figures came out. They filed a renewed motion and said, look, the 2000 census figures support what our expert told you at the time. By then, the trial judge had changed. Judge Eidman had done the pretrial stuff. Judge Pounder had taken over the trial. Judge Pounder says, I'm not going to reconsider another judge's ruling and denied it. Do you have any case where a court has made its ruling based upon population figures that were projected by an expert, even though the next census, whether it be one, two, four, six years later, may have somewhat supported those? I don't offhand know. I didn't look at cases that specifically, but I know the Velazquez of Hillary versus the Velazquez. I mean, you've got to look at cases in this situation, because that's the way you judge the trial courts or the state courts' ruling. Well, the case is Velazquez versus Hillary, a United States Supreme Court case that was many years in the judicial system for many years. And by the time they got it to the United States Supreme Court, they used newer figures in their representation one. And there was no discussion by the United States Supreme Court that we can't use these newer figures. The fact is, in 1999, it was 15.2 percent disparity rate. We can't get around that. Relying on outdated figures simply because it was a census in 1990 and there's no case holding that you can only use census figures, their expert relied on the state's own figures to say this is what the right numbers are. And the state courts continued reliance on wrong numbers, nine-year-old numbers. I mean, and it doesn't take a lot of thought to know. These are judges who live in L.A. County, that the population of Hispanics was growing at a fast rate in the 1990s, and that figures from 1990 are not going to be a fair representation of what was going on in 1999. Do you want to reserve some time? Sure. Thank you. You've got about three minutes left. Okay. Thank you. Good morning. Good morning, Deputy Attorney General J. Michael Landon. On behalf of Respondent Appley, the warden, I will be focusing my argument on the petitioner's first claim unless the court has any questions on his second claim, the Beck claim. Turning quickly to some of my sister counsel's points, I believe she stated that this 15.2 percent absolute disparity was an undisputed figure. That's not what the record says. It wasn't undisputed. There were two sets of figures, and the reason for that is because petitioner himself provided two sets of experts. He initially provided a figure from a Dr. Hayes Batista and his partner, whose name escapes me right now. That was ultimately a census-based figure. And Dr. Hayes Batista's original figure was an absolute disparity of 9.2 percent based on an 18 percent eligibility, subtracting 8.8 being Hispanics on the grand juries in the relevant period. Apparently, petitioner didn't care for those figures because he later hired an entirely different expert, Dr. Weeks. Dr. Weeks then submitted different figures, which were, as Dr. Weeks himself says, projections. Now, Dr. Weeks said that was okay, because these projections come from the California Department of Health and Human Services. However, I'm unaware of any court that's ever accepted that as a basis for these figures. And just to close the loop on that point, that's why we have this disparity. They both come from petitioner's experts. As to the second point, it is true that Dr. Weeks generally averred, that he took into account various factors. I believe he stated in his declaration, it said, page 128, paragraph 4 of the excerpts of record, he claims that he takes into account certain factors. He acknowledges that he does not take into account the one-year residence requirement. He simply says, well, I have no reason to believe that's a problem. The second one is he acknowledges he does not take into account how many felons there are. He seems to confuse that with incarceration rates. Of course, in California, if you are a felon, incarcerated or not, you can't serve in a grand jury. But taking that aside, he generally averred that he took into account citizenship, whether the person was 18, and, if I may just go straight to it, and ability to speak English. That's the extent of his, showing his methodology. That's it. Now, it's not as if Judge Ottoman, the trial court in this instance, simply said, well, I'm not going to consider them. They're not census. What he said was, and again, this was a matter where documentary evidence was taken. The prosecution had an option of bringing its own expert or demanding cross-examination. It looked at these experts and said, well, I can just pick these apart with our own briefing. It did that. There was argument, and the argument and the ruling, of course, is at 165 to 172 of the experts of record. The court specifically says, I did my own research and my own analysis of this. At 167 to 168, Dr. Weeks and the defense haven't made the showing that they have taken the qualifications of being a grand jury into account. In other words, it's a trial court, as a finder of fact, looking at what's been presented to it and saying, I'm not satisfied that this purported expert and this purported methodology is sufficient to do what he says. Again, just to close out, at page 171 of the S.E.R., the Civil and Legislative Records, the trial court says that Dr. Weeks' figures simply are speculation upon speculation. And then the trial court goes on to indicate that the only solid figures that it finds, the trial court, as a fact finder, is the census figures. He calls the others guesstimates and projections, and he once again notes that the trial court does not consider this general affirmment to be sufficient to take into account citizenship. And again, at paragraph 6 of the Weeks' declaration, page 129 of the excerpts of record, Dr. Weeks specifically makes it clear these are projections. So just to clarify that there was a fact finding here. The trial court, in fact, had the evidence before it. It made its decision. Whether petitioner continues to think that decision was wrong, whatever it can be said, it wasn't unreasonable. And under the AEVPA, that must be what we're talking about. Going to the, I believe we've covered the eligibility to serve. There was a motion to renew the motion. A couple things on that. First of all, as a factual matter, there was no renewing of a motion. There was a motion to reconsider under state law. Judge Eideman had not retired. He was simply in a different courthouse. If that were really what petitioner wanted to do, he could have simply brought it before him. But be that as it may... I don't understand your last point. The case has been reassigned to another judge, and now the case belongs to the second judge. You say he could go back to the first judge? California law, as I assume it is in every jurisdiction, the simple point was that this was decided... This motion to reconsider is what it was. It wasn't a renewing. It was a motion to reconsider, as would be in any courtroom. California, as I assume any other jurisdiction, requires or holds that trial judges can't act as essentially appellate judges for each other. And if there's some new evidence that couldn't have been brought before that somehow changes things, for example, the obligation is to go to the actual trial court that ruled on it and say, here's what's new. I'm not familiar with that procedure, that you can go to the old judge once the case has been assigned. You have to go. Is that a local rule? It's case law. I believe it's a California rule of court. I don't know the precise one. We briefed on state matters, and since it was a state law issue, I must say I'm not familiar with it. If you would, to talk about the jury instruction problem that Ms. Dressinger had. Okay, sure. If I may, I'll begin with the Beck point itself. Because, again, as we've argued, Beck has never been extended beyond a situation where the petitioner at the time is on death row. And there's a very important reason for that. Beck arises out of the very Eighth Amendment jurisprudence that states, in essence, death is different. And it's the outcome of a death judgment that's different. And when it comes to that, we have to make sure that we can't allow a jury to not have the options of finding something lesser. Now, it may be that lesser includes finding, for example, the substantive crime, and then having, as in California, an absolute second phase where the jury still has the option of life without parole, which is what happened here. For example, in Beck, the facts were, at the time, in the 70s in Alabama, at that jury, it was unquestioned that the jury had no choice but to either find him guilty and, therefore, subject to death, or acquit him. And the State, in that case, admitted, yes, if this were not a capital case, he would have, under State law, been entitled to these very instructions he asked for. But that, as a matter of State law, didn't allow it because it was a capital case. Now, Beck, again, is this Eighth Amendment jurisprudence. It talks about due process. It talks about due process within the context of Eighth Amendment. Again, as we say, simply because death is different. As we've also indicated in our briefs, no case has, to my knowledge, has ever found the same procedural problem as there was with that particular State's procedure at that particular time. But aside from that, let's just turn to, and just to close off the loop on that, there being no Beck issue, our position is that it's quite clear that there is no Federal issue on the instructions. It's simply a matter of State law error, if there were any. Justice Silverman, as you say, the State had that claim before it, primarily as a State law claim. It decided otherwise. As to the evidence itself, it just simply isn't there. And there's a reason why this all-or-nothing choice happened. And California courts have long chastised California trial courts for presenting juries with an all-or-nothing choice when the evidence doesn't support that, or perhaps could support something lesser. Here, it goes back to the notion of it all depends on the evidence. It's not just possible theories. You have to be able to mesh the evidence so that it fits somewhere in between. This evidence was so extreme, it simply couldn't have fit anywhere in between. Further, when it comes right down to it, there really is no, there couldn't possibly be any prejudice. In addition to the evidence being overwhelming, keep in mind the jury was given an option on the attempted murders to find either premeditation or not. And just to be clear, in California, well, I didn't mean to say in California. If I could point the Court to the specific verdict forms for Mr., to remind the Court, the first murder was of Mr. Cernas. Mr. Cernas was standing next to Mr. Hernandez as Petitioner and Mr. Zatarain pulled up behind them with the lights out. At some point, the two men, or by Mars' or Petitioner's account, started shooting. It was only Zatarain. Either way, at one point, they start shooting. Hernandez and Cernas are standing right next to each other. And Cernas ends up dead. Hernandez gets away.  At 144 of the S.E.R., that's the Cerna verdict form, and S.E.R. 145 is the Hernandez verdict form. There's a separate box, or checking place, if you will, of blank, asking the jury whether it finds premeditation. So in other words, my point is, regardless of the instructions as to the actual murder of Cernas, standing right next to him at the time this all happens is Hernandez. The jury simply couldn't have thought that it was somehow conscious disregard, secondary murder, or implied malice murder, as to Cernas. But standing right next to Hernandez also found premeditated murder as to Mr. Hernandez. So the point I'm getting to is, when it came to premeditation or intent to kill, at least as far as Mr. Hernandez, there was a choice. The jury made it, and they made their call at premeditation. That being the case, it's not possible they could have found secondary murder as to Mr. Cernas under either theory when he was standing right next to him. The other thing to look at with the verdict forms is that there was a personal use of a firearm allegation and finding as to both the Cernas murder, which of course, bringing this back, the premise here is that there was a secondary murder as to Mr. Cernas. That, of course, would not be using a firearm under this theory. However, the jury found that there was a personal use of a firearm, therefore negating any possibility of a second degree. And with my final time, if I may, I want to return to this other point as to this motion to reconsider. Somehow, Mr. Wheat's being right, or Dr. Wheat's being right. As I believe we were getting to earlier, Judge Camp, there has to be a point where this decision is made. This decision was made. If we're going to say it was reasonable or unreasonable by the trial court, it has to be based on the facts before it at the time. And that's what we have here. And lastly, it is not at all clear that Dr. Wheat's final figures based on the 2000 census, in retrospect, were right. They have the same flaws in methodology that his earlier ones. Thank you. Roberts. Ms. Dressner, you've got about three minutes and change left. First, Respondent is incorrect that no case, no court has ever applied Beck under these circumstances. The Rembert Court from the Eleventh Circuit said that it's un equivocal that as long as there is a possibility of death, the defendant has a constitutional right to relevant lesser-includeds, and that was the case which was exactly under these circumstances where he was facing death. The jury ultimately got the jury ultimately gave him life without. And so that the statement that there's no other case that's done that is incorrect. And that is still good law in the Eleventh Circuit and has not been overruled. Let me ask you this. I'm getting back to that because it somehow troubles me that looking back from the 2000 census, the standard that the state court decision is based on is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. I mean, wouldn't that necessarily require that the decision is made at the time, and if it's not unreasonable for him to determine that, then it doesn't matter what the 2000 census indicated? Well, two responses to that. One is the 2000 census came out before this case was still in trial and could have and could have. And so the motion, whether you call it a renewal motion or reconsideration motion, was still at a time when the court could have done something. And Respondent's argument that you go back to the other judge, I don't know where he got that from. There's not anything in any state law that says you do that. The fact is the case was before Judge Pounder's, and you don't get to go pick and go back to another judge unless Judge Pounder somehow decides to do that. But so that even if you accepted that Judge Eidman wasn't convinced, we had the 2000 figures, hard figures, while this case was still in the, and I believe it was in the early stages of the trial. But more importantly was even under the figures that Judge Eidman had from Judge Weeks, it was an understatement. Can you point to a point of time when those figures were presented to the judge and the judge made an unreasonable decision, even though he had those figures before him? Yes, both times. I think it was both when Judge Eidman saw, had the figures from Judge, from Dr. Weeks, and when Judge Pounder had the motion for reconsideration. Both of those were unreasonable decisions. I understand, and I don't want to interrupt you, but what you know when we review this case is we look at the record, and on this record, with the testimony that was there and the facts that were there, there's no doubt about what happened to it. Do you think? Are we back on that question you mean, about what happened at trial or what happened with the statistics? I gather what you're saying is that we have somehow a problem because we didn't have sufficient Hispanic representation in the jury pool. Right, correct. And what I'm suggesting, and maybe I'm wrong, you can tell me what I'm wrong. No matter who was in the jury pool, the case is going to be decided on the evidence. But the law is very clear for the United States Supreme Court on fair cross section and equal protection that subsequently having a fair trial does not remedy if you were indicted by a grand jury. So your bottom line is what? This case should be reversed because what? Because he was indicted by a grand jury that had an underrepresentation of Hispanics. And that's an automatic reversal if under both fair cross section and equal protection, if the three criteria are met and the remedy is not the fact that a fair trial was subsequently had. And, of course, I don't believe this trial was fair, but even if you accept that there was a fair trial, that is not the remedy for it. Regarding if I could add to that. You're out of time, Ms. Grisham. Let's get Judge Camp's question and then we'll ask you to conclude. Yes. I don't know that that is the way I read the case is that was not clearly established by any Supreme Court opinion at the time. And what we're dealing with here is law clearly established by the Supreme Court of the United States. That's why you have to read the cases. You're talking or are you talking on the grand jury? I'm talking about the Fair Cross Jury. Oh, both the two cases whose names are, excuse me, at the moment, the one that's  both say, in cases subsequent to them, that these are not remedied by a fair trial. And I have, that is, that is the state of the law. You don't then go back that they had a fair trial and therefore the grand jury indictment. That would eat the whole issue. You would never be able to raise these post-trial because you could always make that argument. The fact is the law provides that if we're going to have these systems of grand jury indictments that they be done constitutionally. Well, you said in response to Judge Ferris that the law was clearly established that the Sixth Amendment right to fair cross-section applied at the time of this case. And I'm saying that's not my recollection. I may be wrong. I may have overlooked something. But I thought it seemed clear that there was no Supreme Court case, which is, I think, what we are, need to be dealing with here, that extended the right of fair representation to State court grand juries. Now, there were Ninth Circuit cases and a lot of cases that did, but. That during, because during, during versus Missouri that discusses the fair cross-section requirement has been read by numerous circuits and State courts as incorporating that. And my position is that during stands for grand juries in both State court and Federal court. Thank you very much. The case is discharged and submitted. Good morning. Thank you. I think we proceed. Excuse me. I think we proceed with the case. It's unfortunate. We'll submit his on the verdict. He's not here, but we hear the argument from the counsel. That would be my inclination as well, Judge Kagan. You don't, you don't. He has the, his obligation is to be here at 9 o'clock when the case starts. That's when the calendar starts. 0856. It's unfortunate that you've been inconvenienced because we would have heard your argument a little earlier. But now we know and we are at the third case and it's time to move. Your Honor, the capacity is not only inconvenience, it's also, I got to sit outside your garden and get ready for the argument. I don't think there's a better garden anywhere around the courthouse. Do you? It's beautiful. Not around the courthouse. Yes, that's right.
judges: Camp, Farris, Silverman